**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Esparza, et al., | No. CV-24-00230-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Allstate Fire and Casualty Insurance Company, et al., | |
| Defendants. | |

Plaintiffs Victor and Sylvia Esparza ("Esparzas") filed suit against Defendant Allstate Fire and Casualty Insurance Company ("Allstate") for breach of contract, bad faith, and unfair settlement practices. Allstate has moved for summary judgment on all counts. For what follows, Allstate's motion will be granted.

**FACTUAL BACKGROUND**

The following facts are not the subject of reasonable dispute unless otherwise noted. The Esparzas and Allstate filed separate statements of fact in support of their positions. (Doc. 79 at 26-45; "PSOF", Doc. 60; "DSOF") and the Esparzas have filed contravening statements of fact (Doc. 79 at 1-26; "CSOF"). The Court has reviewed the objections and where the proffered evidence was determined inadmissible or immaterial it was not considered to resolve the motion.

Allstate issued a Deluxe Plus Homeowner's Policy ("Policy") to the Esparzas subject to applicable provisions, conditions, restrictions, exclusions, and limitations. As

relevant, the Policy provides Coverage A for Dwelling Protection Coverage, an Additional Living Expense ("ALE") provision for a loss under Coverage A, and Coverage C for Personal Property Protection Coverage. The ALE provision states, "[w]e will pay the reasonable increase in living expenses necessary to maintain your normal standard of living when a direct physical loss we cover . . . makes your residence premises uninhabitable." ALE payment is limited to the least of "(1) the time period required to repair or replace the property . . . using due diligence and dispatch; (2) if you permanently relocate, the shortest time for your household to settle elsewhere, or (3) 12 months." The Policy also contains the following relevant condition:

> **Section I Conditions**
> . . .
> 3. **What You Must Do After A Loss**
> In the event of a loss to any property that may be covered by this policy, **you** must:
> …
> d) give **us** all accounting records, bills, invoices and other vouchers, or certified copies, which **we** may reasonably request to examine and permit us to make copies.
> e) produce receipts for any increased costs to maintain **your** standard of living while **you** reside elsewhere, and records supporting any claim for loss of rental income.

(emphasis in original).

On or about January 11, 2022, the Esparza residence sustained a slab leak that affected the garage, living room, kitchen, and pantry. The Esparzas reported a claim to Allstate on January 12, 2022 and Allstate states the claim was assigned to employee Angelo Maestas. From January 12 to January 14, 2022, the Esparzas state Allstate repeatedly apologized for ignoring their calls about the leak and the water damage.

On January 14, 2022, Mr. Maestas visited the Esparzas house and noted the water was turned off by a plumber and the line was capped. When first investigating the Esparzas' slab leak, Mrs. Esparza testifies Mr. Maestas yelled at the Esparzas for interrupting his dinner and then apologized.

**A. Temporary Housing**

Because no hot water was available and five people, a dog, and a cat were residing in the Esparza residence, Mr. Maestas assigned an Additional Living Expense ("ALE") vendor named CRS Temporary Housing ("CRS") to provide temporary housing for the Esparzas.

After being moved out of their residence, the Esparzas repeatedly moved temporary housing units. On January 15, 2022, the Esparzas were moved to the Hilton Squaw Peak in Phoenix. The Esparzas allege they did not request a resort, but that the family was getting sick from the lack of water and use of equipment in their home, and Mr. Maestas offered to provide a resort to the family. On January 27, 2022, Mr. Maestas advised CRS Allstate would cover reasonable ALE costs until repairs were completed or the Esparzas residence became livable.

On February 1, 2022, CRS sent an email to Allstate stating the Esparzas were requesting a transfer from the Hilton Squaw Peak to a new hotel due to (1) being locked out of rooms due to no credit card on file for incidentals, (2) a lack of water for 4 days, and (3) a leak on the hotel premises. In response to these problems, the Squaw Peak Hilton offered the Esparzas a $500 credit, but due to an alleged misunderstanding about the amount of the credit, the Esparzas accumulated a $1200 bill, and the Squaw Peak Hilton locked the Esparzas out of their rooms for failing to settle the outstanding balance. The Esparzas do not dispute the credit misunderstanding, but allege they instead were locked out of rooms because Allstate and CRS refused to pay for the rooms despite notifying Allstate and CRS about conditions at the hotel. Additionally, the Esparzas provide hearsay evidence that Squaw Peak Hilton called the police and a police report was filed against the Esparzas for trespassing and nonpayment, but the Esparzas have not provided admissible records including the police report or affidavits on summary judgment.

On February 1, 2022, CRS moved the Esparzas to the Homewood Suites. On February 3-4, 2022, the Esparzas again requested a move from the Homewood Suites due to elevator issues which required Mrs. Esparza's 82-year old mother to struggle to climb the stairs and Allstate approved the Esparzas' move to the Renaissance Hotel in Glendale.

On February 17, 2022, because the Renaissance Hotel was sold out on February 18,

the Esparzas were moved to four studio suites with full kitchens at the Residence Inn. On February 18, 2022, the Esparzas were again moved from the Residence Inn to the La Quinta Inn "due to construction that made it difficult to access the hotel and caused a lot of noise." That same day, the Esparzas again requested a move from the La Quinta Inn due to the smell and Mr. Maestas approved Mrs. Esparza's request to book her own hotel if she uploaded hotel invoices. Mr. Maestas also extended the Esparzas temporary housing for a long-term rental until April 20, 2022 due to continued construction delays on the Esparza residence. On February 21, 2022, the Esparzas had a conversation with Allstate representative Jill Jenkins who noted the Esparzas had rejected 20 hotel options[1] presented the previous week.

On February 24, 2022, Mr. Maestas documented a conversation with CRS regarding the Esparzas and a long-term rental. Mr. Maestas's note states CRS informed him they were attempting to contact the Esparzas to review available housing options and if the Esparzas deemed them acceptable, to perform a walk-through of the property before arranging lease agreements.[2] Brian Bressie of Allstate sent an email to Mrs. Jenkins indicating Allstate would "pin down how long to get [Mrs. Esparza] into a house. Then we can give her a cut off day for the hotel. She can either take the home or she can cash out for that amount for a release full and final for ALE."

On February 25, 2022, Allstate received an email from CRS stating the Esparzas rejected a presented offer for long-term housing without viewing the property. On that same date, Mr. Bressie (1) reviewed the offered property, (2) confirmed work on the

---

[1] The Esparzas deny they were offered 20 hotel options, but do not dispute the conversation with Mrs. Jenkins.

[2] Though insurance claim files are generally considered admissible as business records provided they are kept in the regular course of business and meet the requirements of FRE Rule 803(6)(b), that does not mean every item in the file is available for all purposes. *See Traum v. Equitable Life Assur. Soc'y of the United States,* 240 F. Supp. 2d 776, 780-2 (N.D. Ill. 2002) (discussing when insurance claim files are admissible). While the Esparzas raise some hearsay objections, they raise no specific objections to the claim file and the Court finds the claim file generally admissible. Significantly, the Court has not considered parts of the claim file where hearsay objections are well-taken or where evidence is clearly inadmissible.

Esparza's home was scheduled to be completed in mid-April, and (3) spoke with CRS who informed him if Mrs. Esparza accepted the long-term property, a reasonable hotel end date would be March 4, 2022. Mr. Bressie informed the Esparzas Allstate would pay for their hotel until March 4, then the Esparzas faced two options: (1) accept the house presented by CRS and remain there until home repairs were complete, or (2) accept a cash out of $4,692.50 consisting of 6 weeks rent plus the cleaning deposit in exchange for a signed release of the ALE claim.[3] The Esparzas claim Mr. Bressie never offered them long-term housing, told the Esparzas they were spending Allstate's money, and told them they had to accept the settlement or they would get nothing else. On February 27, 2022, the Esparzas sent an email to Allstate recounting difficulties with temporary housing and explaining they rejected long-term properties offered by CRS because they were 25 to 30 miles from their home, and they had not yet received mileage reimbursement from Allstate.

On March 1, 2022, Mr. Maestas sent the Esparzas an email confirming a hotel checkout date of March 4, 2022 and advising the Esparzas he would contact them the next day for settlement of the ALE claim. On March 4, 2022, Mr. Maestas sent an email to Mrs. Esparza advising her he issued payment in the amount of $4,692.50 for 6 weeks of rent plus a $350 cleaning deposit.

**B. Expenses Owed**

The parties dispute reimbursement of expenses under the Policy. It is undisputed on January 19, 2022, after the Esparzas were in temporary housing, Mr. Maestas contacted Mrs. Esparza to provide an update on her claim and to explain he requested a company begin making a repair estimate on the slab leak. The file states "insured said she would be uploading photo of receipts from the plumber and also additional living expense [sic] that had been paid out of pocket." On January 21, 2022, it is undisputed Mrs. Esparza uploaded documents regarding a plumber, assessment of the home cause of loss, and a cap fee to

---

[3] Allstate cited an email from Mr. Bessie at [Exhibit 2, entry February 25, 2022 at 3:52 pm, Bates Labeled ESPARZACLM 0218 to 0219]. While the Esparzas raise no objection, the Court notes the document ESPARZACLM 0219 is not in Allstate's statement of facts. Nevertheless, the parties appear to agree Mr. Bressie conveyed an offer to the Esparzas on this date. The Court deems it admissible and material.

restore water to the home, and Allstate made payments in the amount of $1,369.00. That same day, Mr. Maestas authorized a $1,000 payment to the Esparzas to cover additional food expenses.[4]

On February 3, 2022, Mrs. Esparza asked about partial payment of expenses incurred for food, laundry, estimates, mileage, and their pet. Mrs. Esparza stated Allstate promised payment would be issued two weeks prior and asked, "to escalate the payment." The Esparzas allege they often skipped meals to save money because Allstate refused to pay for their meals.

On February 16, 2022, after failing to reach Mrs. Esparza over the phone, Mr. Maestas made a claim note and emailed Mrs. Esparza asking her as required by the Policy to upload additional receipts for daily food costs. The email and claim note states Mrs. Esparza was spending an average daily amount of $364 for a total of $10,920 over a 30-day period compared with a pre-loss daily average of $10.71 for $321.42 over a 30-day period.[5] Allstate states Mrs. Esparza refused their request for receipts, while the Esparzas claim Allstate already had the needed information allegedly as required by the Policy.

On February 17, 2022, Mr. Maestas entered a claim note outlining previously submitted ALE expenses and noted the receipts he received from the Esparzas totaled less than the $1,000 payment he had previously authorized. Mr. Maestas sent an email providing Mrs. Esparza with (1) an update on construction, (2) notice of extension of temporary housing, (3) a need for laundry receipts, (4) an explanation of how he found the receipts were less than the $1000 previously sent, and (5) an explanation of the ALE policy. Mrs. Esparza responded contending Allstate "constantly lied" about the ALE, was "wrong" about calculations, and incorrectly interpreted the Policy but offered no admissible evidence to support these claims. On February 18, 2022, Mr. Maestas entered a claim note

---

[4] The Esparzas objected to this statement of fact as hearsay and a misstatement of the material facts and evidence. Nevertheless, the Esparzas have not expressly disputed a $1,000 payment was issued and do not dispute later accountings of the $1,000 payment. (PSOF ¶¶ 47, 51; CSOF at ¶ ¶ 46, 50).

[5] While the Esparzas dispute the email and claim note in part, they state they do not dispute the reported amounts they spent or Mr. Maestas's email.

- 6 -

confirming he spoke with Mrs. Esparza. Mr. Maestas's note states though Ms. Esparza felt she had uploaded necessary documents for a reimbursement, he explained to her to get accurate reimbursement "we would need to have all receipts showing the additional cost for reimbursement."

On February 21, 2022, Mr. Maestas entered a claim note recapping claim payments to the Esparzas and noted though Mrs. Esparza claimed additional payments were owed for "plumbing demo and access," additional invoices were needed. On February 23, 2022, following up on a phone conversation the previous day, Allstate manager Jill Jenkins sent an email to Mrs. Esparza informing her about the process of reimbursement for housing, repairs, laundry, mileage, and utilities.[6] On that same day, Mrs. Esparza responded to Mrs. Jenkins' email stating she was not adequately compensated for laundry and requested Allstate reconsider denying her ALE reimbursement demand. Later on the same day, Mr. Maestas, after speaking with Mrs. Esparza, paid the Esparzas $280 for laundry services, $9,516.10 for the estimated total of future construction on the Esparza home, and sent Mrs. Esparza an email explaining the payments.

On March 16, 2022, Mrs. Esparza sent a demand for ALE benefits claiming: (1) $18,200 for meals between January 14 - March 4, 2022, (2) $7,920.90 for mileage, (3) $415 for laundry expenses, (4) $315 for pet expenses, and (5) $738 for utility expenses for a total demand of $27,038.90. On March 22, 2022, Allstate sent an email to the Esparzas to again attempt to explain the documentation needed pursuant to the Policy to adjust the claim and requested details regarding a baseline for food, mileage, and additional utility expenses incurred by the Esparzas. On March 23, 2022, the Esparzas responded claiming again Allstate already had the necessary documentation. On March 25, 2022, Mr. Maestas sent another email asking Mrs. Esparza to provide, in accordance with requirements in the

---

[6] The Esparzas, though objecting to parts of the phone conversation with Mrs. Jenkins offered by Allstate as "hearsay and mistreatment of material facts," do not dispute the conversation occurred with Mrs. Jenkins or the follow-up email. The Court notes part of Mrs. Jenkins's email contained in document ESPARZACLM 1251 is not in Allstate's statement of facts, but without specific objection by the Esparzas, the Court deems it admissible and material.

Policy, a baseline of costs for reimbursement. On March 30, 2022, the Esparzas sent another email without including the required documentation and demanded Allstate pay their full demand in 10 days or they would be forced to seek legal remedies. On April 4, 2025, Mr. Maestas sent another email stating he would resolve the Esparza's claim once additional required Policy information was submitted. In this series of emails, the Esparzas do not dispute no receipts were uploaded, but contend they had already submitted all the information necessary to process the claim and Allstate never intended to make them whole.

Allstate states the following payments were made based on the claim file:

- $1,369.00 Dwelling to Sylvia Esparza on 1/21/22
- $1,000.00 ALE Advance to Sylvia Esparza on 2/7/22
- $316.00 Dwelling to Sylvia Esparza on 2/17/22
- $9,516.00 Dwelling to Sylvia Esparza on 2/23/22
- $280.00 ALE to Sylvia Esparza on 2/23/22
- $4,692.50 ALE to Sylvia Esparza on 3/4/22
- $58,180.03 ALE to CRS Temp Housing on 7/15/22

In their disclosure statement, the Esparzas claim they sustained damages in the amount of $294,416.90. When asked to explain this amount in her deposition, Ms. Esparza did not offer the required Policy documentation but stated she "believe[d] that it's far more" and "I'm not sure how that – that equation came out. I think I looked at the bills. I think I looked at the claim. I was trying to – I'd have to look and see how that all came about."

### C. Other Allegations

The Esparzas make several additional allegations regarding Allstate's conduct, particularly of Allstate representative Mr. Maestas. The Esparzas allege Mr. Maestas, yelled at them on several occasions, mischaracterized their statements, and "planned and deliberately created a scheme to make it appear like he was concerned for Plaintiffs' safety and sorry for not responding to Plaintiffs' urgent calls and yelling at them but he was not."

The Esparzas further allege Mr. Maestas stopped work on their home and intentionally made efforts to deny their claims. Specifically, Mrs. Esparza testified Mr. Maestas "repeatedly engaged in a pattern of bad tactics by causing unnecessary delays, caused breakdowns in communication, stopped all work for repairs of the [sic], refused to communicate with Plaintiffs and trades, lied to housing vendor and Plaintiffs, repeatedly threatened to close Plaintiffs' claim without payment, and mischaracterized Mrs. Esparza." The Esparzas state Mr. Maestas "angered the trades because he instructed Plaintiffs to turn off the equipment and stopped all work." The Esparzas also allege Mr. Maestas "repeatedly reported Plaintiffs and the claim for subrogation and [the Special Investigation Unit]", which he knew was not true and would cause further delays and prevent payment on the claim."

### D. Procedural History

The Esparzas filed a complaint in Maricopa County Superior against Allstate on January 2, 2024 alleging three counts: (1) breach of contract, (2) bad faith, and (3) unfair settlement practices. The Esparzas have also included Count IV entitled "Plaintiff Damages" and Count V entitled "Loss of Wages." On February 1, 2024, Allstate removed this case from Maricopa County Superior Court to this Court. And on January 2, 2025, Allstate filed this motion for summary judgment on all counts.

### LEGAL STANDARD

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The non-moving party must then point to specific facts establishing there is a genuine issue of material fact for trial. *Id.*

At summary judgment, the Court considers only admissible evidence. See Fed. R. Civ. P. 56(c)(1)(B). When considering a motion for summary judgment, a court should not

weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue of material fact exists "if the [admissible] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In ruling on the motion for summary judgment, the Court will construe the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

As a federal court sitting in diversity jurisdiction, the Court applies Arizona substantive law and federal procedural law. *Kauffman v. Jesser*, 844 F. Supp. 2d 943, 949 (D. Ariz. 2012).

## ANALYSIS

### A. Breach of Contract

"When recovery is sought under an insurance contract, the insured has the burden of proving that his loss was due to an insured risk." *Pac. Indem. Co. v. Kohlhase*, 455 P.2d 277, 279 (Ariz Ct. App. 1969). "The insurer, on the other hand, has the burden of showing that the loss was within a policy exclusion." *Id.*

Under Arizona law, a breach of contract claim requires a plaintiff to prove 3 elements: (1) the existence of a contract, (2) a breach of that contract, and (3) resulting damages. *First Am. Title Ins. Co. v. Johnson Bank*, 372 P.3d 292, 297 (Ariz. 2016).

Pursuant to the Policy, Plaintiffs allege they were not adequately reimbursed for (1) laundry, (2) meals, (3) additional living expenses, (4) estimates for repairs, (5) out of pocket expenses, (6) and utility increases. Plaintiffs raise several other allegations that Defendants (1) "refused to act with professional standards, integrity, and fairness," (2) "knowingly and willfully caused delays which damaged Plaintiffs' property", (3) "used unfair settlement practices and . . . required Plaintiff to accept a payment, to vacate the hotel, and to pay for their own repairs and housing," (4) "engaged in egregious, unfair and dishonest acts", and (5) "failed to adopt and practice a standard covenant of good faith and fair dealings."

Defendants argue Plaintiffs have not alleged specific facts in their Complaint to

show violations of Dwelling Protection Coverage – Coverage A or Personal Property Protection Coverage – Coverage C. Plaintiffs do not address this argument in their Response beyond reiterating an assertion in the Complaint that Defendants refused to pay for repair estimates and required Plaintiffs to pay for their own repairs. Plaintiffs' Complaint and Response do not specifically identify any contractual duties breached under these coverages nor have Plaintiffs set forth specific facts other than their own testimony that Defendants have failed to provide repair expenses. Rule 56 requires the non-moving party to "set forth specific facts showing there is a genuine issue for trial" and not to "rest upon the mere allegations or denials of [the party's] pleading." Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co, Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Accordingly, summary judgment will be granted finding Defendants did not breach any contractual duties based on Dwelling Protection Coverage – Coverage A and Personal Property Protection Coverage – Coverage C.

With regards to Alternative Living Expenses for a loss under Coverage A, the Policy provides Plaintiffs must "produce receipts for any increased costs to maintain your standard of living while you reside elsewhere." Plaintiffs have not offered admissible other than their oral testimony that Defendants have not reimbursed expenses for which it is alleged they have provided required receipts to Defendants. It is undisputed Defendants repeatedly explained to Plaintiffs, pursuant to the Policy terms, it was necessary to provide receipts to establish these expenses and that Plaintiffs would be reimbursed only when such receipts were provided. (PSOF ¶¶ 36, 40, 42, 48, 61, 63; CSOF ¶¶ 36; 40; 42; 48; 60; 62). And yet despite repeatedly receiving this information and reminded of the Policy terms, Plaintiffs did not provide necessary documentation and insisted to Defendants without proof that they already had provided the necessary information to calculate their expenses.

At this motion for summary judgment, Plaintiff has offered nothing but their own conclusory and often inadmissible statements that Defendants were provided sufficient receipts to cover their claimed ALE expenses. Plaintiffs have not identified what specific receipts were submitted or even copies of them, when they were submitted and to whom, why they were sufficient, nor any basis for recovering the thousands of dollars claimed

were owed to them. Despite the modest burden Plaintiff is under to resist a motion for summary judgment, when considering an insurance breach of contract claim, summary judgment is appropriate when "Plaintiff's conclusory assertion unsupported by either fact or evidence does not present an adequate record to support a finding in his favor." *Thompson v. Property & Cas. Ins. Co.*, 2015 U.S. Dist. LEXIS 16807, at *36-37 (D. Ariz. 2015); *see also Marks v. U.S. Dep't of Justice*, 578 F.2d 261, 263 (9th Cir. 1978) ("Conclusory allegations unsupported by factual data will not create a triable issue of fact."). Additionally, case law on ALE expenses provides an insured cannot survive summary judgment on a breach of contract claim when the insured fails to provide admissible evidence of "receipts or proofs of payment for his alternative living expenses . . . Nor[] any evidence that, under this or any contract, Defendant was obligated to advance [insured] the alternative living funds." *Christopherson v. Am. Strategic Ins. Corp.*, 483 F. Supp. 3d 631, 639 (E.D. Wis. 2020), *aff'd*, 999 F.3d 503 (7th Cir. 2021). Summary judgment will be granted finding Defendants did not breach any contractual duties based on Alternative Living Expenses under Coverage A.

While Plaintiffs raise an additional array of breach of contract allegations against Defendants regarding bad faith, Plaintiffs have not set forth admissible facts alleging any additional way in which Defendants might have breached a Policy provision. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' breach of contract claim.

**B. Bad Faith**

"The tort of bad faith arises when the insurance company intentionally denies, fails to process or pay a claim without a reasonable basis for such action." *Noble v. National Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981). "To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying the benefits of the policy and the defendant's knowledge or reckless disregard of a lack of reasonable basis for denying the claim." *Id.* at 868 (internal citations omitted). Further, a plaintiff must show that an insurer acted "intentionally, not inadvertently or mistakenly and that the [insurer] dealt unfairly or dishonestly with the [insured's] claim or failed to give fair or equal consideration to [insured's] interests." *Rawlings v. Apodaca*, P.2d 565, 577-78 (Ariz. 1986).

Plaintiffs allege Defendants repeatedly engaged in dishonest, malicious, or oppressive conduct to avoid liability. In addition to breaching the contract, Plaintiffs allege that Defendants (1) yelled at Plaintiffs and called them liars, (2) caused the police to be called on Plaintiffs, (3) caused delays for repairs to the Plaintiffs' property, (4) refused to take phone calls, (5) threatened to close their claim, and (6) referred their claim to the Special Investigation Unit ("SIU") and subrogation. Defendants argue these allegations are factually deficient or fail as a matter of law and the Court will consider each in turn.

### 1. Yelling or Calling Plaintiffs' Liars

Plaintiffs allege Defendants' representatives called them liars or yelled at them based on Mrs. Esparza's August 6, 2024 deposition. Defendants argue allegations based only on Plaintiffs' own testimony are insufficient, as Plaintiffs have not identified any letters or emails complaining that Defendants called Plaintiffs a liar, any letters or emails from Defendants' representatives accusing Plaintiffs of lying, nor have Plaintiffs expounded on what Defendants accused them of lying about.[7]

In *Montoya Lopez v. Allstate Ins. Co.*, 282 F. Supp. 2d 1095 (D. Ariz. 2003), the insureds alleged an insurance company acted in bad faith by delaying the processing of their claim. The court held the insured's attorney's "claims that [the adjuster] was 'obstructionist' and that her conduct indicated she did not want to interview Mr. Lopez do not create an issue of material fact because they constitute inadmissible hearsay." *Id.* at 1101. "In addition, his self-serving letter, written only six days after he responded to [the adjuster's] request, stating that she was being uncooperative, proves nothing. At most, it is his own opinion." *Id.* The court held "[t]here simply is no objective evidence of unreasonable delay" and the insureds "also fail[] to provide evidence of [the adjuster's] subjective unreasonableness." *Id.* The Esparza's allegations that Allstate representatives yelled or called them liars is based solely on their own testimony and is accordingly insufficient to establish bad faith.

---

[7] Defendants note Plaintiffs allege "Allstate contended the estimate submitted by Plaintiffs' contractors was fraudulent and it was untrustworthy," but argue no such assertion is made in the cited claim file ESPARZACLM 1254. The Court agrees.

- 13 -

### 2. Causing Police to be Called on Plaintiffs

Plaintiffs allege Defendants' failure to pay the hotel bill led the Squaw Peak Hilton to call the police who filed a police report against the Esparzas for trespassing and nonpayment. Defendants argue the police call occurred because Mrs. Esparza inadvertently overspent a $500 credit provided by the hotel, and Plaintiffs have neither provided the police reports nor any other evidence that the police were called because Defendants failed to pay the hotel. Additionally, it is undisputed CRS employee Tiffany Taylor "asked the resort manager not to call the police because Plaintiffs were invited guests at the resort and not trespassers."

Regardless of the reasons for the police call, Plaintiffs have cited no authority that requires Defendants to prepay Plaintiffs' ALE expenses at the hotel rather than pursuant to the terms of the Policy as later reimbursements, nor responsibility for the actions of hotel employees who are not agents of Allstate. This allegation is thus insufficient to establish bad faith against Defendants.

### 3. Causing Delay for Repairs to Plaintiffs' Property

Plaintiffs also allege Defendants' actions caused repairs to the Esparza's property to be delayed. In particular, Plaintiffs allege Defendants caused trade workers on their home to be upset with them, that Plaintiffs were individually required to contact trade workers obtain the scope, work, sketches, and timeline for repairs, and that Defendants refused to accept an estimate submitted by Plaintiffs' contractors. All the allegations regarding the trade workers are inadmissible hearsay. And Defendants argue the record indicates "repairs were on hold till the pipe that caused the loss was rerouted." (Exhibit 9 to Plaintiffs' Response, Doc. No. 78-2, entry 1/27/2022 at 11:11 a.m., Bates Labeled ESPARZACLM 1301). Defendants also argue Plaintiffs' allegations omit several emails in the record where Defendants directly contacted trade companies to obtain documentation on the claim, job scope, and timeline. Plaintiffs also admit "Mr. Maestas informed Plaintiffs that he wanted to communicate directly with the trades and not involve Plaintiffs." (CSOF ¶ 33).

Plaintiffs have not provided admissible evidence beyond their own testimony that

Defendants caused delays to their home repairs. As in *Montoya Lopez*, "[t]here . . . is no objective evidence of unreasonable delay" and the insureds "also fails to provide evidence of [the adjuster's] subjective unreasonableness." 282 F. Supp. 2d at 1101. Accordingly, Plaintiffs have not established bad faith on this allegation.

### 4. Refusing to Take Plaintiffs' Calls

Plaintiffs also allege Defendants refused to take Plaintiffs' calls. Defendants argue while Plaintiffs were not always able to speak with Mr. Maestas, on nights and weekends, Plaintiffs were able to contact Allstate's on call-manager, a Saturday duty manager, and the third-party housing vendor CRS's After-Hours Specialists. Defendants further respond it is undisputed that Defendants responded to each of the Esparza's 20 complaints in the record and Plaintiffs have not demonstrated in the Policy or any authority requiring Defendants to be on-call 24 hours or that other employees cannot be used to take calls on nights and weekends. Based on the record and the lack of cited admissible facts and authority, Plaintiffs' allegations are insufficient to support a claim of bad faith.

### 5. Threatening to Close Plaintiffs' Claim

Plaintiffs also allege Defendants repeatedly threatened to close their claim. However, Plaintiffs have not presented evidence in the record besides their own testimony that Defendants threatened to close their claim. Additionally, the fact an insurer informs an insured they are closing the insured's file until they receive additional items "does not mean [insurer] acted in bad faith absent a showing that this resulted in some sort of financial advantage or that it resulted in additional delay in payment of [insured's] claim." *Montoya Lopez*, 282 F. Supp. 2d at 1101-02. Accordingly, Plaintiffs' allegation is insufficient to support a claim of bad faith.

### 6. Referring Plaintiffs' Claim to SIU and Subrogation

Plaintiffs repeatedly allege Defendants referred their claim to SIU and subrogation. However, a referral of claim to SIU is not actionable without "evidence that the referral of the claim to SIU was made to harm [insured]." *Robles v. Am Zurich Ins. Co*., 2022 WL 22864986 at *8 (D. Ariz. 2022) (internal citations omitted).

Plaintiffs have provided no evidence of a subrogation referral nor any way in which

subrogation would impact their rights under the Policy. While there is evidence of an SIU referral in the claim file, Plaintiffs have provided no evidence other than their own testimony Defendants' SIU referral was made to harm or derive financial advantage. Thus, these allegations cannot support a claim of bad faith.

### 7. Conclusion

Plaintiffs have not alleged Defendants have breached the Policy, nor are any of Plaintiffs' additional allegations sufficient to support a claim of bad faith. Accordingly, Defendants are entitled to summary judgment on bad faith.

### C. Unfair Settlement Practices

Plaintiffs' next count alleges Allstate engaged in unfair settlement practices. However, under Arizona law, there is no independent tortious action for unfair settlement practices separate from bad faith. While the Arizona Unfair Claim Settlement Practices Act, A.R.S. § 20-461, provides limitations on insurance company practices, the statue "exclusively provides an administrative remedy" and nothing in the section "is intended to provide any private right or cause of action." Accordingly, Allstate's motion for summary judgment on unfair settlement practices will be granted on this count.

### D. Damages

Lastly, Count IV - Plaintiff Damages alleges Plaintiffs are seeking "general damages, property damages, and special damages, and other losses and miscellaneous expenses." Count V – Loss of Wages alleges Plaintiffs "have suffered anxiety, worry, emotional stress, fear, feelings of hopeless [sic], lost wages, and other damages to be determined at trial" and seeks "an award for all their damages including punitive damages. . . ."

These counts are not separate causes of action, they are forms of potential relief to the other counts. *See Sisemore v. Farmers Ins. Co of Ariz.*, 779 P.2d 1303, 1305 (Ariz. Ct. App. 1989) ("[Punitive damages] is not a 'claim' that can be enforced separately from the bad faith claim."). Summary judgment will be granted on these remaining counts because they fail to state a claim upon which relief can be granted.

## CONCLUSION

Plaintiffs have not shown a genuine issue of material fact exists for trial on any of their counts. Accordingly, the Court will grant Allstate's Motion for Summary Judgment in its entirety.

**IT IS ORDERED** Defendant Allstate's Motion for Summary Judgment (Doc. 54) is **GRANTED.** The Clerk of Court is directed to enter judgment in favor of Defendant and close this case.

Dated this 9th day of September, 2025.

Honorable Roslyn O. Silver
Senior United States District Judge